UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RICHARD LEE PAQUETTE,

              Petitioner,

vs.                                    Case No. 3:03-cv-130-J-32TEM

JAMES R. MCDONOUGH, et al.,[1]

              Respondents.

_____

### REPORT AND RECOMMENDATION[2]

### I. Status

Petitioner is an inmate of the Florida penal system who initiated this action by filing a pro se Petition for Writ of Habeas Corpus (Doc. #1) pursuant to 28 U.S.C. § 2254 on February 19, 2003.  On September 15, 2004, the Court appointed the federal public defender to represent the Petitioner.  On January 10, 2005,

---

[1] James R. McDonough, the Interim Secretary of the Florida Department of Corrections, is substituted as the proper party Respondent for James V. Crosby, Jr., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] Any party may file and serve objections hereto within **TEN (10) DAYS** after service of this opinion.  Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from contesting factual findings on appeal.  See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b), 6(a) and (e); Local Rules 6.02(a) and 4.20(a), United States District Court for the Middle District of Florida.

Petitioner's counsel filed an Amended Petition for Writ of Habeas Corpus (Doc. #27) (hereinafter Amended Petition).

Petitioner challenges his 1999 state court (Putnam County) conviction for armed robbery on the ground that his plea of nolo contendere was involuntary and violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution because counsel failed to: (1) protect Petitioner from an unknowledgeable and invalid waiver of his rights to a trial, to silence and to put the state to its proof; and, (2) determine, develop and investigate the relevant facts, witnesses and evidence. On February 18, 2005, Respondents filed their Amended Response to Amended Petition (Doc. #31) (hereinafter Amended Response). On May 20, 2005, Petitioner's Reply to State's Amended Response (Doc. #37) (hereinafter Reply) was filed.

On July 15, 2005, the Court granted Petitioner's request for an evidentiary hearing. The initial hearing was held on October 3, 2005. Because one witness failed to appear at the October 3, 2005, hearing, the Court held the remainder of the evidentiary hearing on November 14, 2005. Petitioner's Post-Hearing Memorandum (Doc. #68) was filed on December 15, 2005. Respondents filed their Post Hearing Memorandum (Doc. #71) on February 17, 2006. Thus, this case is ripe for review.

## II. Procedural History

On February 25, 1999, Petitioner was charged by Information with one count of armed robbery.  Ex.[3] A at 14.  On July 19, 1999, Petitioner entered a plea of nolo contendere to the charge.  Id. at 27; Ex. G at 75-89.  On October 4, 1999, Petitioner was adjudicated guilty of this offense, and sentenced to fifteen years of imprisonment, followed by ten years of probation.  Ex. A at 44-52.

On direct appeal, Petitioner's appellate attorney filed an Anders[4] brief.  Ex. B.  On October 17, 2000, the Fifth District Court of Appeal per curiam affirmed the judgment of conviction without issuing a written opinion.  Ex. E.  The mandate issued on November 3, 2000.  Ex. F.

On October 19, 2000, Petitioner filed a "Memorandum of Law in Support of Motion for Post Conviction Relief."  Ex. G at 1-38.  On January 30, 2001, the trial court entered an order, which stated, in pertinent part:

> First, the Court notices that only a Memorandum of Law supporting his postconviction motion was filed without an actual Motion for Postconviction Relief containing the requirements set forth in Rule 3.850(c), Florida Rules of Criminal Procedure (2000).  All facts relied upon to support a motion for postconviction relief must be set forth under oath in the motion itself, and only matters of law may be presented in a

---

[3]  The Court hereinafter refers to the exhibits contained in Respondents' Appendix (Doc. #7), filed April 17, 2003, as "Ex."

[4]  Anders v. California, 386 U.S. 738 (1967).

3

supporting memorandum. Jones v. State, 637
So.2d 999 (Fla. 1st DCA 1994). As such, the
memorandum is insufficient to qualify as a
properly filed motion and must be denied
without prejudice to file a facially
sufficient motion. See Basnight v. State,
574 So.2d 307 (Fla. 1st DCA 1991).
Notwithstanding, even had the allegations
contained in the memorandum been asserted in a
proper postconviction motion, the Defendant
failed to plead prejudice with sufficient
specificity to support his ineffective
assistance of counsel claims. See Cunningham
v. State, 748 So.2d 328 (Fla. 4th DCA 1999).

Ex. G at 41. Accordingly, the trial court denied the motion

without prejudice to Petitioner's filing of a facially sufficient

motion. Id. at 42. Petitioner did not appeal the trial court's

order.

On April 23, 2001, Petitioner filed a Motion for Post

Conviction Relief pursuant to Fla. R. Cr. P. 3.850, in which he

raised the following grounds: (1) trial counsel was ineffective for

failing to consult and meet with Petitioner before trial; (2)

counsel was ineffective when he misadvised Petitioner regarding the

amount of time he would be required to serve; (3) counsel was

ineffective for failing to investigate the charges, failing to

consult with Petitioner about all possible defenses, and failing to

investigate or depose key witnesses who would have supported a

voluntary intoxication defense; (4) counsel was ineffective for

failing to object to improper comments made by the prosecutor; (5)

fundamental error occurred when the prosecutor knowingly misled the

court regarding Petitioner's prior offenses; (6) counsel was

4

ineffective for failing to correct or object to incorrect information regarding Petitioner's prior offenses; (7) fundamental error occurred when the trial court failed to inquire whether Petitioner waived a voluntary intoxication defense after Petitioner told the court that he had no recollection of committing the offense. Id. at 43-58.

On February 7, 2002, the trial court entered an order scheduling an evidentiary hearing "on the issue of whether the Defendant's trial counsel was ineffective for failing to inform him of the defense of voluntary intoxication." Id. at 97. In the same order, the court found the remainder of Petitioner's claims to be without merit. Id. at 95-97. The evidentiary hearing was held on April 16, 2002. Id. at 157-208. On April 18, 2002, the trial court denied Petitioner's remaining claim, finding that "counsel's failure to inform the Defendant of the availability of [a voluntary intoxication] defense constituted a sound tactical decision and not ineffective assistance of counsel." Id. at 135.

Petitioner appealed the denial of his 3.850 motion. Ex. H; Ex. J. On October 29, 2002, the Fifth District Court of Appeal per curiam affirmed the orders denying the Rule 3.850 motion without issuing a written opinion. Ex. K. The mandate issued on November 15, 2002. Ex. M.

As noted above, Petitioner initiated this action in this Court on February 19, 2003. Thus, Respondents assert, and this Court

agrees, that this action was timely filed within the one-year limitations period for filing Section 2254 petitions.  <u>See</u> 28 U.S.C. § 2244(d)(1); <u>see</u> <u>also</u> Response to Petition (Doc. #5), filed April 11, 2003, at 5-6.

### III.  Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claim under 28 U.S.C. § 2254(d), as amended by AEDPA. <u>Nelson v. Alabama</u>, 292 F.3d 1291, 1294-95 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 926 (2003); <u>Fugate v. Head</u>, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, 535 U.S. 1104 (2002); <u>Wilcox v. Florida Dep't of Corr.</u>, 158 F.3d 1209, 1210 (11th Cir. 1998), <u>cert</u>. <u>denied</u>, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review under AEDPA and has explained:

> The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this [action] and limits our review of the decisions of the state courts:
>
> > A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law,

or (2) resulted in a decision that
was based on an unreasonable
determination of the facts in light
of the evidence presented in state
court.

Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th
Cir. 2003) (citations omitted).  A general
framework of substantial deference governs our
review of every issue that the state courts
have decided:

> [A] state-court decision can be
> "contrary to" this Court's clearly
> established precedent in two ways.
> First, a state-court decision is
> contrary to this Court's precedent
> if the state court arrives at a
> conclusion opposite to that reached
> by this Court on a question of law.
> Second, a state-court decision is
> also contrary to this Court's
> precedent if the state court
> confronts facts that are materially
> indistinguishable from a relevant
> Supreme Court precedent and arrives
> at a result opposite to ours.
>
>         . . . .
>
> [A] state-court decision can
> involve an "unreasonable
> application" of this Court's clearly
> established precedent in two ways.
> First, a state-court decision
> involves an unreasonable application
> of this Court's precedent if the
> state court identifies the correct
> governing legal rule from this
> Court's cases but unreasonably
> applies it to the facts of the
> particular state prisoner's case.
> Second, a state court decision also
> involves an unreasonable application
> of this Court's precedent if the
> state court either unreasonably
> extends a legal principle from our
> precedent to a new context where it

> should not apply or unreasonably
> refuses to extend that principle to
> a new context where it should apply.
>
> Williams v. Taylor, 529 U.S. 362, 405-07, 120
> S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000).

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th

Cir.), cert. denied, 126 S.Ct. 803 (2005).

The Eleventh Circuit addressed the application of the

"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme
> Court." McIntyre v. Williams, 216 F.3d 1254,
> 1258 (11th Cir. 2000).

Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir.), cert.

denied, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine

whether the state court's adjudication resulted in a decision that

was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding. Furthermore,

AEDPA "also directs that a presumption of correctness be afforded

factual findings of state courts, which may be rebutted only by

clear and convincing evidence. See id. at § 2254(e)(1). This

presumption of correctness applies equally to factual

determinations made by state trial and appellate courts." Bui v.

8

<u>Haley</u>, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.  <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003).  Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## IV.  Summary of the Evidentiary Hearing Testimony and Evidence

Petitioner called Kevin Robert Monahan as his first witness at the evidentiary hearing.  Mr. Monahan was appointed to represent Petitioner in three separate armed robbery cases.  Tr.1[5] at 7-9. The case at issue here concerns the armed robbery of a convenience store on January 16, 1999 (case number 99-154-CF-52).  <u>Id</u>. at 9-10. Mr. Monahan knew that voluntary intoxication was a valid defense to robbery in 1999.[6]  <u>Id</u>. at 10-11, 64.

---

[5]  The Court hereinafter refers to the transcript of the first portion of the evidentiary hearing on October 3, 2005 (Doc. #64) as "Tr.1" and the second portion of the evidentiary hearing on November 14, 2005 (Doc. #66) as "Tr.2."

[6]  The voluntary intoxication defense was abolished in Florida as of October 1, 1999.  <u>See</u> Fla. Stat. § 775.051 (1999).

9

Before meeting with the Petitioner for the first time, Mr. Monahan received a letter from Petitioner, "detailing the drug problem he had." Id. at 12. This letter was admitted at the hearing as P.E.3.[7] When Petitioner met with Mr. Monahan, he stated that he had been using drugs on the day in question and that "he was messed up on crack that day." Tr.1 at 16-17. Mr. Monahan described his first few meetings with the Petitioner as follows:

> [M]ost of the time I worked his case, I worked the other two cases. I think in the very first meeting I had with Mr. Paquette, he had indicated to me that he had -- that he was guilty of the first of the -- of the one robbery for which we entered the plea. But he said -- and he said, I did that one. I -- you know, I accept responsibility for that one, in effect, but I had nothing to do with the other two.
>
> And I said -- and, of course, he had given a taped confession or a confession to the first one.[8] And so for the most part, my initial point there was to work the other two,

_____

[7] The Court hereinafter refers to the exhibits appended to Petitioner's Exhibit List (Doc. #55) as "P.E." The Court hereinafter refers to the exhibits appended to Respondents' Exhibit List (Doc. #56) as "R.E."

[8] See R.E.2. Petitioner described in his confession how he initially entered the store to commit the robbery, "but [he] chickened out[.]" Id. at 3-4. Grady Gilbert encouraged the Petitioner to commit the robbery and the two of them smoked another piece of crack cocaine. Id. at 5. Grady Gilbert gave the Petitioner a knife. Petitioner put on a hat and some sunglasses, and Grady Gilbert told him that nobody would recognize him dressed like that. Id. at 6-7. He then described how he entered the store the second time and picked out a piece of candy. He described the clerk as a "heavy set boy." Id. at 8. As the clerk rang up the purchase, the Petitioner "put the knife on the counter" and said "go ahead and give me the rest." Id. at 8-9. Petitioner left the store with the money and got into his car. Id. at 9-10. Grady Gilbert asked Petitioner how much money he got. Id. at 10-11. Then, they "went straight to go buy some more rocks [of cocaine]." Id. at 11.

> which I felt were quite likely going to go to
> trial.  And, frankly, I did not do much on the
> first case after that first meeting.  I think
> there was -- the sense I had was that we would
> be pleaing [sic] to that one or including that
> in any type of plea agreement, but that the
> other two would be the focus of the defense.

Id. at 19.

Petitioner's counsel then asked Mr. Monahan, "Did Mr. Paquette at any time in his meetings with you indicate that he had no recollection of the robbery of the Fast Track store?"  Id. at 20. Mr. Monahan replied, "There was one occasion where he -- and this was at the holding cell, where he said he didn't -- where he told me he didn't remember, that he had no recollection of that case." Id.  Petitioner's counsel then asked Mr. Monahan, "Did you follow up and ask him why he didn't have any recollection of the robbery itself?"  Mr. Monahan answered as follows:

> Not really.  I'll be honest with you.  I
> frankly dismissed it as just something he was
> saying, because not only, you know, I had
> worked off the transcript at our first
> meeting, and we had spoken about it at the
> first meeting and he had not made a claim of
> amnesia or any type of blackout or anything at
> that time, and so when he brought it up there
> at the holding cell, I frankly just -- I
> didn't give it much weight.  I think I
> dismissed it.

Id.

Mr. Monahan thought that Petitioner's drug use could be used in mitigation because his illegal drug usage resulted from his inability to obtain sufficient prescription drugs for his chronic

back injury.  Id. at 21-22.  Mr. Monahan obtained some records from Petitioner's doctor and some pharmacy records.  Id. at 22. However, Mr. Monahan never "considered the voluntary intoxication defense."  Id. at 22.

Petitioner's counsel asked Mr. Monahan if he ever told Mr. Paquette that he had no defense to the charge in case number 99-154-CF-52, and Mr. Monahan replied:

> I don't know that I used those terms.  I think that at our first meeting, we talked about it, and at that point I -- I think he himself indicated that he was willing to enter a plea of guilty to that one, admit to that one.  And then we went on to the other two, where we -- where he was in -- where he denied any involvement in the other two robberies.
>
> So I never -- looking back, of course, the only possible defense he could have had would have been voluntary intoxication, and I did not bring that issue up to him.  I think I probably told him that it is not a defense, that you're -- that you're driven by the addiction to commit the crime.  But I don't -- I'm fairly certain I never mentioned the only possibility would have been voluntary intoxication, because I think I just never -- you know, that defense just never came to me at that time.

Id. at 23.

Mr Monahan described why the voluntary intoxication defense did not occur to him.

> Well, of course, you know, he was -- in his original taped statement and in the original interview that I had with him, he was pretty clear about what he had done that particular day.  So that the issue of, you know, a blackout or anything else, was never

12

even discussed.  So the -- as far as the other
two robberies were concerned, you know, he was
speaking what I felt was very plain and
forthright as to all three of them.

Id. at 25.

I think in my reading of the discovery and in
my interviews with Mr. Paquette, I -- you
know, the defense of voluntary -- I guess it's
a perceptual problem, you know, that to me,
voluntary intoxication is you're so messed up,
you don't know what you're doing.  In fact,
this letter would do a fairly good job of
describing someone that would be a voluntary
intoxication defense.  But, you know, at the
time, the primary document I was working on
was his taped transcript, which, you know,
gave quite a few details and so on.

So I just -- the nature of that
transcript, which I was working off, I did not
feel gave rise -- did not -- and, of course,
his own admission to me that he had been
messed up off drugs, and he and Mr. Gilbert
had went [sic] and committed the crime in the
fashion he described, I just -- the actions
that evening just seemed too purposeful for me
to give rise to the voluntary intoxication
defense.

I think he even discussed being scared
and going in once and changing his mind and
coming back out and then going back in again.
This -- that's why I don't think the -- you
know, it's not like I thought of the voluntary
intoxication defense, weighed it and discarded
it.  I just never got to the point where I saw
voluntary intoxication.  If it's there, I
missed it.

Id. at 26-27.

Mr. Monahan testified that he never interviewed the clerk who

was robbed in case number 99-154-CF-52.  Id. at 29.  He did not

interview Grady Gilbert because he was Petitioner's co-defendant

13

and "was also under charge at that time, so he was unavailable."
Id. He contacted Petitioner's wife, Regina Paquette, by telephone
and "she did advise [Mr. Monahan] of [Petitioner's] drug problem."
Id.

Petitioner's counsel asked Mr. Monahan if he ever contacted
any of the potential witnesses that Petitioner identified in his
letter to Mr. Monahan (P.E.3). Id. Mr. Monahan recalled making a
number of telephone calls after the plea and before the sentencing
hearing, but he could not recall which individuals he was able to
reach. Id. Mr. Monahan did not depose anyone in connection with
case number 99-154-CF-52. Id. at 30. He did not consult with any
experts who might have helped to formulate a voluntary intoxication
defense. Id. at 44.

Petitioner sent the trial judge a letter after he entered his
plea in case 99-154-CF-52, in which he stated, in pertinent part,
the following: "Sir, I have been told by my attorney that even
though I have no memory of the crime at the time it occurred and
being addicted to medication, was inadmissible in a court of law."
Id. at 31-32. Petitioner's counsel asked Mr. Monahan whether he
had ever told the Petitioner that his drug use or drug history
would be inadmissible, and Mr. Monahan replied:

> No. No, I wouldn't -- I -- you know, I
> think when I first dealt with the claim that
> he had no recollection of it, it was somewhat
> late in the game. And as I said, I simply
> pretty much dismissed it out of hand as
> inconsistent with our earlier conversations.

> And also, with the -- the taped statement that
> he gave, I just didn't find it to be a
> credible claim, and that's why I didn't give
> it much weight.   It would have been a
> credibility problem, in my mind, as opposed to
> an admissibility problem.

Id. at 32.

Mr. Monahan was asked when the Petitioner first told him that

he had no recollection of committing the robbery, and he replied:

> In fact, I believe it was after the plea
> that he -- because on the plea date, he was
> amenable to the plea, which is what we had
> originally gone along with.  So we had -- you
> know, he had -- from initially, he had agreed
> to the plea, and on the one charge he admitted
> to, was going to contest the other two.
>
> I think it was at a later time after the
> plea, but this is my best recollection, that
> it was after the plea that he began claiming
> that he had no memory of it.  Because I do
> remember it was in the holding cell where we
> spoke about the claim of no memory at all of
> this particular -- this particular offense.
> And, as I said, I didn't -- it was more a case
> of not finding it to be a credible claim as
> opposed to telling him, no, it wouldn't be
> admissible anyway.  As I said, I -- as I said,
> I didn't give it much weight.
>
>              .  .  .  .
>
> I remember on that day talking to him, the day
> he indicated he had no recollection of it, he
> was agitated.  And on the day that we entered
> the plea, I remember it going very smoothly,
> and there wasn't much in the way of agitation
> or anything of that nature.   So that day,
> things more or less went fairly smoothly.  It
> was at a later date that I think the issue --
> I think it was at a later date.   It's a
> possibility at a pretrial or something, he may
> have done something along those lines, but I

think it was after the plea that -- while we
-- so that's my best recollection.

Id. at 32-33.

Petitioner's counsel asked Mr. Monahan whether, after reading
Petitioner's letter to the judge, he considered voluntary
intoxication as a potential defense issue, and he replied as
follows:

> That wasn't my reaction to the letter,
> because I remember what my reaction to the
> letter -- and my reaction to the letter was,
> you know, he's making things worse, you know,
> the -- initially, if you go back and read his
> taped statement, it seemed like he was
> forthcoming, regretful about these things.
> And I -- to me, there was just no -- at that
> time I didn't really see a credible way to
> make a claim that he could not remember what
> had happened that day.
>
> That was so inconsistent with the
> recorded account and the transcribed account
> that he had given to law enforcement at that
> time, that the idea of maybe we've got a good
> defense now, maybe a good defense has surfaced
> here, which is what I would have been looking
> for as to whether I could make the case that
> he actually was in a blackout condition when
> these things were occurring, but my thinking
> was he was simply going -- that he was -- at
> that time I was thinking sentencing. And I
> thought he was making worse -- everything
> somewhat worse by absolving himself of all
> responsibility and not taking responsibility.
> I didn't think it was a good letter to write
> to a judge before sentencing.
>
> But in terms of did I think now I should
> withdraw the plea, no, that was not a reaction
> that I had to this letter. It was a different
> reaction. But I can certainly see where the
> content would have shown some dissatisfaction

on his part with having entered the plea at
that stage.

Id. at 34-35.

Respondents' counsel asked Mr. Monahan in what context the
Petitioner and he spoke about Petitioner's drug addiction, and Mr.
Monahan replied:

> Basically, his -- he was very, very emotional.
> I mean, it was a very -- something he felt
> very strongly about, that as a result of
> having had some medical problems, that he had
> sought treatment from Dr. Gefon, who he had
> focused his attention on, that he had become
> severely addicted to drugs and that that had
> brought him to where his life was at that
> time, which was based essentially in ruins.
> So that was essentially what it was, is that,
> you know -- that through what I would view as
> medical malpractice or medical impropriety,
> that he had been turned into this seriously
> addicted individual.

Id. at 54-55.

When asked whether Petitioner ever inquired about a defense
based upon his drug addiction, Mr. Monahan responded, in pertinent
part, as follows:

> Well, I'm not sure he would have even
> known about the voluntary intoxication
> defense, if it -- it would have -- I mean,
> don't -- it didn't trigger it in me, and so I
> never told him about it, but he was just
> telling me his history.   And I think -- I
> think he was speaking in terms of it being a
> defense, but, in my opinion -- and I told him
> that it wouldn't be a defense, that it would
> be a matter of mitigation.   That's how I
> related it to him.   But I think that he saw
> this as a defense, or I mean -- I don't think
> he used the legal terms, this is going to be
> my defense.   I mean, but I think he was giving

17

> me his history for my evaluation, and that's
> how I evaluated it.

Id. at 55-56.

When asked whether the Petitioner ever expressed a desire to challenge the charge in case 99-154-CF-52, Mr. Monahan replied:

> At our first meeting, no.  And -- and on
> the date of the plea, no.  But on the occasion
> where he was agitated in the holding cell and
> told me that he didn't even remember any of
> the events of that day, and I think in looking
> at that letter I was just read, I think it
> would seem to be very clearly there that he
> would have wanted to contest it.

Id. at 58.

The Petitioner testified that on the morning of January 16, 1999, he took the following prescription medications: Lorcet, a pain medication; Soma, a muscle relaxer; Desyrel, an anxiety relief medication; and, Stadol, a medication for migraine headaches.  Id. at 102-04.  Later that morning, Petitioner accompanied his wife, Regina Paquette, to Jacksonville, where she obtained and filled prescriptions for Xanax, Percocet and Oxycodone.[9]  Id. at 104-06. At approximately 10:30 or 11:00 a.m., after leaving the pharmacy, Mrs. Paquette bought a six-pack of beer.  Id. at 106.  On the way from Jacksonville to Palatka, Petitioner drank the six-pack of beer and took two Xanax pills and two Oxycodone pills.  Id. at 106-07.

---

[9]   According to the Physicians' Desk Reference, Xanax is a tranquilizer used for relief of anxiety.  Percocet and Oxycodone are narcotic analgesics used to treat moderate to moderately severe pain. See www.pdrhealth.com.

After arriving back at his home, Petitioner smoked some marijuana and continued to drink beer. _Id_. at 108. Later, Mrs. Paquette's cousin, Elbert Gilbert, brought some crack cocaine over to the Paquette's home, and Petitioner smoked approximately ten "rocks" of crack cocaine between 1:00 p.m. and 7:30 p.m. _Id_. at 109-11. During that period of time, he continued to smoke marijuana and take prescription medication. _Id_. at 111. During the day in question, Petitioner estimated that he took fifteen Lorcet tablets, three or four Soma tablets, ten to fifteen Desyrel tablets, an entire bottle of Stadol (which contained ten doses), ten to fifteen Oxycodone tablets, ten Xanax tablets, and an entire bottle of Hydromet syrup[10] (which contained 180 doses). _Id_. at 112-14. Petitioner estimated that he drank "maybe a case of beer" that day. _Id_. at 164.

Petitioner went to the store, and when he came back to his home, he found his "wife having an affair with her cousin[,]" Elbert. _Id_. at 114-15. Petitioner argued with Elbert, and then Elbert left. _Id_. at 115. Later that evening, Mrs. Paquette's brother, Grady Gilbert, arrived at the residence. _Id_. at 115-16. Petitioner described what happened next as follows:

> We -- during that period of time, me and
> Regina were fighting about me taking it all.
> At that point I had taken almost all her

---

[10] According to the Physicians' Desk Reference, Hydromet Syrup is a cough suppressant containing Hydrocodone, a narcotic for pain relief. _See_ www.pdrhealth.com

> medication.  I took it completely away from
> her, and I just started eating it like it was
> going out of style.  Grady came in, and me and
> him had a little argument about his sister.
>
> And the next thing you know, she got --
> she got all mad, saying, "Well, you done took
> all my drugs.  You done took all my
> medication, you know, you need to go get me
> something to smoke."

Id. at 116.

Regina Paquette, Grady Gilbert and the Petitioner drove in the
Paquette's car to Orange Mills to purchase more cocaine.  Id. at
116-17.  The three of them continued to smoke crack cocaine on the
way to Orange Mills and after they arrived there.  Id. at 117-18.
Grady suggested that they rob a store to obtain money to purchase
more crack.  Id. at 118.  Petitioner described what occurred next:

> Q.[11]  Once you're in the car and Grady says
> something about robbing a store, what happened
> next?
>
> A.  Regina turned -- well, actually, Regina
> kept on pushing it.  Regina, she turned
> around.  She wanted to go to the store.
>
> Q.  What store are you talking about?
>
> A.  That's how it all started.  We started to
> go to the Suwannee Swifty on the corner, and
> Grady -- no, Coastal Mart on the corner.  And
> Grady Gilbert said, "Don't go there."  So we
> pulled on down by the Cheyenne Saloon and got
> ready to pull in there, and Grady turned
> around and said, "No, park right there."  And
> Regina said, "All right."

---

[11] Petitioner's counsel is asking the Petitioner the questions
during this colloquy.

Q.  What happened next?

A.  Grady turned around, asked me, he goes,
"Are you going to go in and get some money, or
are you going to go, you know, get Regina
something to smoke?"   And I said, "No."
Regina turned around.  She goes, "Well, you
could at least go get -- you could at least go
get me something."  So I kind of -- the part
about me going in the store and me admitting
going in the store and coming back out, I just
went in -- I walked into the store just to
make it look like I walked in the store to try
to satisfy my wife.

Q.  What happened then?

A.  I left.

     . . . .

Q.  When you pulled up and parked that first
time, who was driving?

A.  Grady Gilbert was.

Q.  And where was Regina?

A.  She was sitting in the back seat.

Q.  And were you sitting -- where were you
sitting?

A.  I was sitting in the passenger side.  I
couldn't even drive.  I couldn't even see.

Q.  After you returned to the car from being
inside the store, what happened then?

A.  She got mad at me because I -- because I
didn't go get her some money and I didn't go
get her some crack, because you could buy
crack right there.

Q.  In this convenience store?

A.  No.  Right there by that parking lot.
There's a crack neighborhood right there in

21

Satsuma.  They sell all kinds of it right there.

Q.  What happened then?

A.  She got all mad at me.  She turned around and told me to leave.  She said she wanted to leave, take her home.  So we got up and we drove away.

Q.  Who was driving at that point in time?

A.  Grady Gilbert.

Q.  Still Grady?

A.  Yes, ma'am.

Q.  And were you still in the passenger seat?

A.  Yes, ma'am.

Q.  And Regina was still in the back seat?

A.  Yes, ma'am.

Q.  And where did you drive to?

A.  Down the road.  Grady turned around -- had a piece in his pocket.  He turned around and said, "Here, smoke this.  You might get a little" -- I don't want to say the word.

Q.  Courage?

A.  Yeah, courage.  That would be a nice way to put it.

Q.  And when you said a rock, is that crack cocaine?

A.  Yeah.  He had a piece of rock in his pocket.

Q.  Just in case not everyone is familiar with the drug term, though, when you're saying "rock," you mean crack cocaine?

22

A.  Crack cocaine, yes, ma'am.

Q.  And you smoked that?

A.  Yes, ma'am.  Actually, I smoked the whole thing to make him -- he got ticked off about it, and I really don't remember anything from that time on.

Q.  Do you have any independent recollection of what happened next?

A.  Not really.

Q.  What was the next event that you remember?

A.  Waking up; my wife telling -- I got up, I think it was Monday morning, Sunday morning. I'm not very sure.  I got up, got dressed, made a cup of coffee and started to walk out the door to go to the store and get some cigarettes.

.  .  .  .

A.  My wife stopped me.  She turns around, she goes, "Richard, you can't go there.  Don't do that."

Q.  Did she say why you couldn't go to the store?

A.  Yeah.  I asked her.  I said, "What are you talking about?"  I said, "I got to walk this off."  I thought she just wanted me to drive the car or something.

Q.  What did she answer?

A.  I turned around and she goes, "You don't want to go there, Richard."  She says, "You robbed a store last night."

Id. at 119-23.

Petitioner asked his wife and Grady Gilbert questions about what had occurred.  Id. at 124-25.  Petitioner was arrested for the

robbery a couple of days later, and he gave a statement to the police. Id. at 125-27. Petitioner's counsel asked him whether the statement that he gave to the police officers was based upon his own recollection of the events, and the Petitioner replied:

> Actually, it was based on what I had been told and what I started remembering, because it was -- see, as soon as she started telling me -- as soon as she started telling me, I started thinking about it really hard, and then I started remembering a whole bunch of little bits and pieces. Then actually, I started remembering a whole bunch of it.

Id. at 127.

Petitioner was detained at the Putnam County Jail, where he wrote a letter to the Public Defender's Office, explaining that he did not remember the robbery due to the drugs he had consumed. Id. at 128-32; P.E.2. Later, Mr. Monahan was appointed to represent the Petitioner. Tr.1 at 132. During their first meeting, the Petitioner told Mr. Monahan "about the medications." Id. at 133. Mr. Monahan told the Petitioner he would obtain medical releases. Id.

Petitioner met with Mr. Monahan again approximately three to four weeks later. Id. at 134. Mr. Monahan said, "I've looked into your testimony." Id. at 135. He also told the Petitioner, "You made a detailed statement." Id. The Petitioner told Mr. Monahan that he was still on medication on the day he gave the statement to the police, but he had not received any medication that day. Id. at 135-36. He gave Mr. Monahan a list of the medications he had

24

taken on the day of the robbery.   <u>Id</u>. 136, 137-38; P.E.3.   He explained that he had no recollection of committing the robbery and that the only reason he knew what had happened was "because Regina and Grady told [him] about it." Tr.1 at 136. Then, he asked Mr. Monahan, "Is there any way I can use that?" <u>Id</u>.   Mr. Monahan replied, "No, no, no." <u>Id</u>.   Petitioner then asked Mr. Monahan if he could see a doctor, and Mr. Monahan told him that the state would not pay for anything like that. <u>Id</u>.

The third time Petitioner met with Mr. Monahan was in the holding cell at the courthouse, where Mr. Monahan said, "Well, we'll get this one out of the way, and we'll set the other ones for trial." <u>Id</u>. at 141. Petitioner testified as follows with respect to the remainder of the meeting in the holding cell:

> I had asked him again in that holding cell, I said, you know, there's nothing I can do about this, about, you know, the medications that I was on, the state of mind I was in, all the problems that I had because, you know, it was a great blow on me prior to that, about what had happened about my wife and all that, me taking all that medication, that I didn't really remember most of it.
>
> And he turned around and he goes, "No, you're not insane.  And, no, you have no defense.  You need to go in there. We're going to make -- I made a deal with the judge, and we're going to take -- go ahead and plea, and then we'll set these other ones for trial."

<u>Id</u>.

Mr. Monahan never advised Petitioner of the possibility of a voluntary intoxication defense.  Id. at 142.  If Mr. Monahan had advised Petitioner that he had a potential defense of voluntary intoxication, he would not have entered a plea of nolo contendere in case number 99-154-CF-52.  Id.

After entering his plea, Petitioner wrote a letter to the judge, expressing his concerns about pleading nolo contendere.  Id. at 144; P.E.4.  Mr. Monahan never spoke to Petitioner about the letter he had written to the judge.  Tr.1 at 144.  Mr. Monahan never told him about the possibility of withdrawing his plea.  Id.

The next witness called by Petitioner at the evidentiary hearing was Scott Parker, the store clerk who was robbed by Petitioner on January 16, 1999.  Tr.2 at 5.  He described the robbery as follows:

> Well, basically the defendant came in and he -- he had come in earlier that day, earlier that night I mean, probably I guess 15 minutes earlier and he bought a -- I think it was probably a ten cent gum ball or mint ball or whatever it was, and he came back in right -- I was just locking the door when he came to the door, and I let him in.  And he walked around to the candy aisle and I was back behind the register then and it was 11 cents is what the candy ball was anyway, and the drawer was already open because I had just ran the report, so I didn't have a no sale or I didn't ring it up yet.  And he handed me 11 cents exactly, and that's when he said that he wanted -- he pulled the knife out and he wanted the rest of the money that was in the

> drawer and to not to pull the clip[12] that was
> in the drawer.

Id. at 7-8.

Petitioner's counsel asked Mr. Parker whether the Petitioner appeared to be impaired or intoxicated at the time of the robbery, and Mr. Parker replied, "No, ma'am, he seemed to be doing fine. He was just nervous, but as anyone would be, I guess, that was going to rob someone. But other than that, he seemed like he was -- I mean, I'm not an expert, of course, but he seemed like he was not under the influence of anything." Id. at 8-9.[13]

The final witness called by Petitioner was Joseph Palmer, a Senior Investigator for the Federal Public Defender's Office. He interviewed Mr. Parker by telephone prior to the evidentiary hearing. During this telephonic interview, Mr. Palmer asked Mr. Parker how Mr. Paquette appeared during the robbery, and Mr. Parker told Mr. Palmer that the Petitioner "appeared to be cracked out." Tr.2 at 22. Furthermore, Mr. Parker told Mr. Palmer that the Petitioner was "always cracked out." Id. According to Mr. Palmer,

---

[12] The "clip" is the device that activates the store security camera. R.E.3 at 1; Tr.2 at 12.

[13] Mr. Parker's statement to the police was also admitted into evidence. See R.E.3. In that statement, Mr. Parker described how the robber came into the store the first time and bought a piece of candy. Approximately fifteen minutes later, the robber returned and brought another piece of candy to the counter. At that time, the robber pulled out a knife and said, "Now give me what[']s left in the register[.]" Id. at 1. The robber also said, "don't even think about pulling the clip[.]" Id.

Mr. Parker's exact words were, "I've never seen him frigging sober." Id. at 22-23.

## V.  Findings of Fact and Conclusions of Law

### A. Ground One

In ground one, Petitioner contends that he received ineffective assistance of counsel because his attorney failed to advise him of a voluntary intoxication defense.  He further asserts that, had he known of such a possible defense, he would not have pled nolo contendere and would have insisted on proceeding to trial.

As noted above, Petitioner raised this claim in state court, and after conducting an evidentiary hearing on this issue, the trial court adjudicated the claim as follows:

> **THIS MATTER** came before the Court on April 16, 2002 for an evidentiary hearing on one of the issues raised in the Defendant's Motion for Postconviction Relief.  This Court allowed the Defendant an evidentiary hearing only on the issue of whether his trial counsel was ineffective for failing to inform him of the voluntary intoxication defense for the crime of Armed Robbery in Case Number 99-154. All other claims raised in the Defendant's Motion for Postconviction Relief were previously denied.  The Defendant was represented during the hearing by Assistant Public Defender Bill Bookhammer.
>
> At the hearing, the Defendant testified under oath that in his two meetings with his attorney, he informed him of the prescription medication, alcohol, and crack cocaine consumed the day of the offense and his lack of recollection of the crime.  He also stated that his attorney told him that no defenses

were available to him.  He claimed that he
would not have pled to the crime had his
attorney told him of the availability of the
defense of voluntary intoxication.

The Defendant's trial counsel, Kevin
Monahan, testified at the hearing that he did
not specifically inform the Defendant of the
voluntary intoxication defense as it related
to Case Number 99-154, but he also stated that
this omission was part of his trial strategy
in representing the Defendant.  At the time
counsel was appointed, the Defendant had two
pending robbery charges and a pending
attempted robbery charge which were all
similar in nature and close in time to one
another.  See Informations, attached hereto as
**Appendix A**.  After the Defendant's arrest only
days after the crime, he gave a statement to
police giving detailed information regarding
his involvement in the robbery offense in Case
Number 99-154, but denied any participation in
the robberies charged in Case Numbers 99-183
and 99-184.  As Mr. Monahan intended on trying
all the cases together, he stated that his
best line of defense for Mr. Paquette was to
use this confession to defend against the
robbery charges in Case Numbers 99-183 and 99-
184 as his chances of succeeding in Case
Number 99-154 were remote due to the detailed
nature of the confession.  Had counsel allowed
the Defendant to claim voluntary intoxication
as a defense in Case Number 99-154, this would
have contradicted the Defendant's own
confession, weakened the best defense
available to the Defendant on the other two

cases,[14] and also hurt the Defendant's credibility.

Mr. Monahan testified during the hearing that he was well-aware of the Defendant's drug history, but decided not to use the voluntary intoxication defense as part of his strategy. Having reviewed the record and evaluated the evidence presented during the hearing, the undersigned agrees that counsel's failure to inform the Defendant of the availability of this defense constituted a sound tactical decision and not ineffective assistance of counsel.

Ex. G at 134-35.

This Court must evaluate the state court's adjudication of this claim pursuant to § 2254(d). First, this Court must identify the clearly established federal law with respect to this claim. "[I]n the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" Maharaj v. Sec'y for Dep't of Corrs., 432 F.3d 1292, 1308 (11th Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense

---

14 The Court notes that Petitioner did not elect to proceed to trial in his two other robbery cases. After he was sentenced in case 99-154-CF-52, he entered a nolo contendere plea to accessory after the fact to armed robbery in case 99-183-CF-52 and accessory after the fact to attempted armed robbery in case 99-184-CF-52. See Ex. A at 36-38, 63. He received two, concurrent, five-year sentences in those two cases. Id. at 63-69. The sentences in those two cases ran concurrently with the sentence at issue in this case (case 99-154-CF-52). Id. at 69. Thus, Petitioner has completely served the sentences in cases 99-183-CF-52 and 99-184-CF-52. Petitioner does not challenge his convictions in cases 99-183-CF-52 and 99-184-CF-52 in this action.

counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (per curiam) (citations omitted). In order to succeed on an ineffective assistance of trial counsel claim concerning a guilty plea, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness (deficient performance); and, (2) a reasonable probability that, but for counsel's unprofessional errors, he would not have pleaded guilty and would have insisted on going to trial (prejudice). See Hill v. Lockhart, 474 U.S. 52, 57-59 (1985) (extending the test adopted in Strickland v. Washington, 466 U.S. 668 (1984) to cases involving guilty pleas).

"A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" Bradshaw v. Stumpf, 125 S.Ct. 2398, 2405 (2005) (quoting Brady v. United States, 397 U.S. 742, 748 (1970)). Thus, ineffective assistance of counsel may also require that a plea be set aside on the ground that it was involuntary because voluntariness implicates not only threats and inducements but also ignorance and incomprehension. See Hill v. Lockhart, 474 U.S. at 56 (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)) (noting that the "longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and

31

intelligent choice among the alternative courses of action open to the defendant.'").

> "A guilty plea is open to attack on the ground that counsel did not provide the defendant with 'reasonably competent advice.'" Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980) (quoting McMann v. Richardson, 397 U.S. 759, 770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970)); see Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S.Ct. 366, 370-71, 88 L.Ed.2d 203 (1985) (holding that, in the plea context, a habeas petitioner establishes ineffective assistance of counsel by demonstrating that counsel's advice and performance fell below an objective standard of reasonableness, based upon which he pled guilty). For a guilty plea to "represent an informed choice" so that it is constitutionally "knowing and voluntary," the "[c]ounsel must be familiar with the facts and the law in order to advise the defendant of the options available." Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983). "The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the Strickland analysis . . . as such an omission cannot be said to fall within 'the wide range of professionally competent assistance' demanded by the Sixth Amendment." Hill, 474 U.S. at 62, 106 S.Ct. at 372 (White, J., concurring) (quoting Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)).

Finch v. Vaughn, 67 F.3d 909, 916 (11th Cir. 1995).

Here, the trial court did not cite Hill v. Lockhart as the controlling Supreme Court authority. Furthermore, the trial court's finding that counsel's intentional failure to inform the Petitioner of a voluntary intoxication defense was a sound tactical

decision[15] is directly contrary to Hill, 474 U.S. at 62 ("The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the Strickland analysis[.]") and Alford, 400 U.S. at 31 (noting that the "longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'").

Additionally, the trial court did not address whether there was a reasonable probability that, but for counsel's unprofessional

---

[15] The transcript of the state court evidentiary hearing has been provided to this Court. See Ex. G at 157-207. Mr. Monahan's testimony at that hearing was very brief. See id. at 196-204. Mr. Monahan never testified that, as part of his defense strategy, he intentionally failed to inform Petitioner of a possible voluntary intoxication defense. Instead, he stated that his strategy was to focus on trying the three robbery cases together. Specifically, he stated, in pertinent part, the following:

> I think I went so far as to explain to him that I felt that when it came down to the Jury measuring his testimony against the testimony of Grady Gilbert and [William] Howell [(Petitioner's co-defendants in the other two robbery cases)], a lot was going to depend upon him being -- you know, him coming across as forth -- him being forthcoming about the one charge he acknowledged [(in case number 99-154-CF-52)]. That's how I explained the strategy to him. I never said to him this is -- this is how I told him, you know, I was going to defend the cases, but I didn't sit there and say, by-the-way, I am not going to use voluntary intoxication as a defense, here is why. I never went and explained to him why I was throwing that out. I explained to him why I was -- how I was going to defend. Basically -- and the emphasis was on the two [robberies] he was denying. That -- I have to admit, that was just about the focus. Everything else was attacking the testimony of Gilbert and Howell.

Id. at 203.

error, Petitioner would not have pleaded guilty and would have insisted on going to trial. Accordingly, this Court need "not defer to the state court because it did not rule on the [prejudice] prong (thus, there is nothing to defer to as to that sub-issue)." LeCroy v. Sec'y, Fla. Dept. of Corrections, 421 F.3d 1237, 1262 (11th Cir. 2005), cert. denied, No. 05-8707, 2006 WL 452545 (U.S. Feb. 27, 2006).

In sum, given the factual finding made by the trial court (that Mr. Monahan considered and rejected a voluntary intoxication defense and purposefully failed to advise the Petitioner of such a possible defense), the trial court's finding of no deficient performance was contrary to clearly established law. Furthermore, the trial court did not address whether Petitioner would not have pleaded nolo contendere and would have insisted on going to trial had counsel advised him of a voluntary intoxication defense. Thus, this Court will not defer to the state court's adjudication of this claim and will now address ground one on the merits.

## 1. Findings of Fact[16]

At the initial meeting between the Petitioner and Mr. Monahan, the Petitioner told Mr. Monahan that he was guilty of the robbery charge in case number 99-154-CF-52 and that he did not wish to proceed to trial in that case.   The Petitioner told Mr. Monahan that he had consumed drugs and alcohol on the day of the robbery in question; however, prior to entering his nolo contendere plea in case number 99-154-CF-52, Petitioner did not tell Mr. Monahan that he had no recollection of committing the robbery.   The first time Petitioner told Mr. Monahan that he had no recollection of

---

[16] Where the testimony of the Petitioner differed from the testimony of Mr. Monahan, the Court credited the testimony of Mr. Monahan over the testimony of the Petitioner in making these findings.   In making that determination, the Court evaluated the demeanor of these witnesses on the stand and their responses to the questions propounded.   Furthermore, the Petitioner's testimony at the hearing--indicating that he was dissatisfied with Mr. Monahan's representation prior to his nolo contendere plea--is contradicted by his sworn testimony to the contrary at his plea hearing.   See Ex. G at 80, 88.   Additionally, the Court found Petitioner's testimony regarding the amount of prescription drugs he consumed on the day of the robbery to be incredible.   Although there was no expert testimony on the issue, it is inconceivable that someone who had consumed such a large amount of narcotics, alcohol and cocaine could function at the level exhibited by the Petitioner during the robbery. Further, the Court notes that, in his confession, Petitioner stated that he had been smoking crack cocaine and that he had not taken any medication for three to four days prior to the robbery.  R.E.2 at 3, 18. Additionally, Mr. Monahan testified that the Petitioner told him he was using crack cocaine that day because he had run out of his prescription medications.    Tr.1 at 16-18.    The Court also finds incredible Petitioner's assertion that he had no independent recollection of the robbery and that he learned of the facts surrounding the robbery, as set forth in detail in his confession (see R.E.2), from Mrs. Paquette, Mr. Gilbert and the police officers who questioned him.    It was only after counsel for Respondents stated that Mrs. Paquette and Mr. Gilbert could not have told Petitioner what happened while he was in the store that the Petitioner, for the first time, claimed the police officers who questioned him told him what to say in his statement.  See Tr.1 at 155-60.

committing the robbery charged in case number 99-154-CF-52 was after Petitioner entered his plea of nolo contendere.[17]  Mr. Monahan dismissed this claim because the Petitioner had given a detailed confession and had relayed detailed facts concerning the robbery to Mr. Monahan.

Mr. Monahan did not consider, and then reject, a voluntary intoxication defense.[18]  Instead, the defense never occurred to him because the Petitioner's confession was so detailed and, when

_____

[17] The Court bases this finding on Mr. Monahan's testimony that it was his "best recollection" that this conversation occurred after the plea because he remembered the plea colloquy going very smoothly.  See Tr.1 at 32-33.  This Court has also reviewed the plea colloquy and finds it significant that the plea went very smoothly and that Petitioner twice expressed his satisfaction with defense counsel. See Ex. G at 80, 88. The Court notes that Mr. Monahan received a letter from the Petitioner before meeting with him for the first time, in which the Petitioner stated he could not recollect the robbery.  However, at that point, Mr. Monahan was not sure to which of the three robberies the Petitioner was referring. See Tr.1 at 12-14; P.E.3.  Even after the initial meeting, Mr. Monahan did not associate the letter with the robbery in case number 99-154-CF-52 because he did not remember discussing a black-out with the Petitioner, except for the one discussion after the Petitioner entered his plea.  Tr.1 at 21, 32.

[18] The Court acknowledges that this factual finding is contrary to the factual finding made by the trial court (that Mr. Monahan considered and rejected a voluntary intoxication defense and purposefully failed to advise the Petitioner of such a possible defense).  Given the limited testimony presented at the state court evidentiary hearing, this Court does not find the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  As an additional matter, this Court must presume that the state court's factual findings are correct unless the Petitioner rebuts the presumption by clear and convincing evidence.  See 28 U.S.C. § 2254(e).  However, in this case, the factual determination made by the state court is favorable to the Petitioner, and the Petitioner did not attempt to rebut it.  Thus, it is unclear if § 2254(e) applies in this situation.  Even assuming § 2254(e) does apply, the Court finds that, in light of the evidence presented at the hearings before the undersigned, the state court's finding is rebutted by clear and convincing evidence.

Petitioner described the robbery to Mr. Monahan during their initial meeting, his rendition of the events was also detailed. Mr. Monahan did not investigate a voluntary intoxication defense for the robbery in case number 99-154-CF-52 because it did not occur to him and because the Petitioner told Mr. Monahan that he did not wish to proceed to trial in that case.

The Petitioner would not have insisted on proceeding to trial if Mr. Monahan had informed him of a voluntary intoxication defense.  As noted previously, Petitioner's confession to the police contained a detailed recollection of the events preceding, during and immediately following the robbery.  Many of these details could not have been relayed to Petitioner by Mrs. Paquette and Mr. Grady because they were in a car across the street from the store.  Furthermore, as noted previously, the Court finds the Petitioner's assertion that the police officers told him what to say in his confession to be incredible.  It is also highly likely that a jury would have also found it to be incredible if the Petitioner asserted that he had no independent recollection of the robbery and only knew of the details, as set forth in his confession, from what others told him.

Additionally, it appears Scott Parker would have testified that, when the Petitioner came into the store the second time the evening of January 16, 1999, he pulled out a knife, "said now give me what[']s left in the register" and "also said don't even think

about pulling the clip[.]"  R.E.3 at 1; Tr.2 at 7-8.  Apparently,

Mr. Parker would have also testified that the Petitioner did not

appear to be intoxicated at the time.  Tr.2 at 8-9.[19]

Furthermore, Petitioner offered nothing but his own self-

serving testimony in support of his claim that he was impaired to

the extent that he could not form the intent to commit the crime.[20]

He identified several witnesses who could have testified about his

intoxicated state (his ex-wife, Grady Gilbert, Christina Gilbert

and Officer Huckleberry); however, he did not call any of these

---

[19] The Court is not finding that Mr. Parker's testimony is more credible than Mr. Palmer's testimony with respect to what Mr. Parker told Mr. Palmer about the Petitioner's condition at the time of the robbery. Instead, the Court finds that it is likely that Mr. Parker's sworn testimony at trial would have mirrored his sworn testimony at the evidentiary hearing before the undersigned.

[20] The Court notes that its findings of fact and conclusions of law would remain the same even if the Court considered the Affidavit of Petitioner's ex-wife, Regina Duffy (hereinafter Duffy's Affidavit). This Affidavit is appended to Petitioner Paquette's Motion to Expand the Record (Doc. #50), which the Court previously denied.  In Duffy's Affidavit, Regina Duffy stated that, on the day of the robbery, the Petitioner was on his third day of a crack cocaine binge.  She stated that, on that day, the Petitioner smoked between six and eight rocks of crack cocaine, consumed at least a six-pack of beer, and taken pain pills.  She said that by the time of the robbery, "he was really messed up[.]"  Duffy's Affidavit at 2.  However, she did not state that he was so intoxicated that he did not know what he was doing at the time of the robbery or that he could not remember the robbery.  She does not corroborate Petitioner's claim that she and Mr. Gilbert had to tell the Petitioner what he had done because he could not remember the robbery. In fact, she claims that, on the night in question, the Petitioner told Grady Gilbert that he needed to go to the bathroom, so they stopped the car at the Bar Cheyenne, across the street from the convenience store. She states that "Richard got out, and we did not see him again until minutes later, when we saw him on the other side of the street from the bar, running from the convenience store.  We drove the car in his direction and picked him up."  Id.  Therefore, Duffy's Affidavit contradicts Petitioner's testimony, in that Regina Duffy claims that she and Grady Gilbert did not know that Petitioner was going to rob the store and they did not observe any part of the robbery.

witnesses at either his state court evidentiary hearing or the hearings before the undersigned. Thus, the Court does not find Petitioner's assertion that these witnesses could have established a voluntary intoxication defense to be credible.

Therefore, the Court finds that it is highly unlikely that the affirmative defense of voluntary intoxication would have succeeded at trial because Petitioner's confession contained a detailed account of the events and his purposeful actions before, during and after the robbery were inconsistent with the actions of a person who was so intoxicated that he could not form the requisite intent. Furthermore, if Mr. Monahan had advised Petitioner of a possible voluntary intoxication defense, it is clear that he would have told Petitioner such a defense was highly unlikely to succeed. Accordingly, the Court finds that the Petitioner would not have insisted on proceeding to trial if Mr. Monahan had informed him of a possible voluntary intoxication defense.

## 2. Conclusions of Law

This Court finds that counsel's performance was not deficient. Mr. Monahan had reviewed Petitioner's detailed confession prior to their first meeting and Petitioner also gave a detailed account of the robbery to Mr. Monahan at their first meeting. Furthermore, Mr. Parker's statement in the police report described the robber's purposeful actions.

The Florida Supreme Court "has emphasized that 'voluntary intoxication is an affirmative defense and that the defendant must come forward with evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged.'" Dufour v. State, 905 So.2d 42, 52 (Fla. 2005) (per curiam) (quoting Linehan v. State, 476 So.2d 1262, 1264 (Fla. 1985)). The fact that Mr. Monahan "[n]ever saw this defense when [he] was evaluating the case," Tr.1 at 64, was objectively reasonable because the Petitioner's detailed description of the events surrounding the robbery and his purposeful actions prior to, during and after the robbery were inconsistent with a voluntary intoxication defense.

Furthermore, "counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial[.]" Agan v. Singletary, 12 F.3d 1012, 1018 (11th Cir. 1994) (quoting Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam)). Here, the Petitioner told Mr. Monahan at their initial meeting that he did not wish to proceed to trial in case number 99-154-CF-52. Petitioner also told Mr. Monahan about his drug problem, and Mr. Monahan submitted information about Petitioner's drug dependency in mitigation at sentencing. See R.E.5. The fact that Mr. Monahan did not pursue this issue further in an attempt to establish a voluntary intoxication defense was objectively reasonable because the facts did not support such a defense and Petitioner had

40

expressed a desire to enter a plea rather than proceed to trial in case number 99-154-CF-52.   Thus, counsel's performance was not deficient.  See White v. Singletary, 972 F.2d 1218, 1222 (11th Cir. 1992) (finding that defense counsel's failure to present voluntary intoxication as a defense in a capital murder prosecution was not beyond the range of reasonable professional judgment, and thus did not amount to ineffective assistance, in view of the inconsistency of an intoxication defense with the deliberateness of the defendant's actions during the shootings), cert. denied, 514 U.S. 1131 (1995); Respondents' Post Hearing Memorandum (Doc. #71) at 14-15.

Even assuming arguendo that counsel's performance was deficient, Petitioner has not shown prejudice.   In cases such as this, "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."  Hill v. Lockhart, 474 U.S. at 59 (citing Evans v. Meyer, 742 F.2d 371, 375 (7th Cir. 1984)).[21]

---

[21]  In Evans, the appellant also claimed that his attorney was ineffective for failing to advise him of an intoxication defense.  The court set forth the facts in the Evans case as follows:

> At 4:30 one morning Evans entered a police station and asked the radio operator, Lonbom, to call Detective Azbill for him. Lonbom told Evans to call Azbill himself, using a telephone in another office. Evans left but returned shortly and placed a steak knife against Lonbom's neck and told him to

As noted previously, the facts in this case did not support a voluntary intoxication defense.  Thus, based upon this Court's factual findings set forth above, the Court finds there is no reasonable probability that, but for counsel's failure to advise Petitioner of a voluntary intoxication defense, Petitioner would not have pleaded nolo contendere and would have insisted on proceeding to trial.  Accordingly, Petitioner has not shown that he was prejudiced by counsel's failure to advise him of a voluntary intoxication defense.

---

> call Azbill and tell him to come to the station. Lonbom did as told. When Azbill arrived, Evans told him to unload his gun and place the gun and cartridges on the counter; Azbill complied. Evans then told Azbill to go and get a police report on him. Azbill again did as told. When he returned he noticed that Evans had reloaded Azbill's gun and was holding it. Azbill expressed some concern about this turn of events but Evans assured Azbill that he was afraid of guns and never used them. Evans let Lonbom leave the station, and Evans and Azbill then spent an hour and a half discussing the contents of the police report and also the question of Evans' visitation rights with his daughter. Azbill told Evans he thought he could bring the daughter to the station and Evans told him that that was what he wanted. Azbill brought the child to the station, where Evans spoke with her privately for a while and was then arrested. . . .

Evans v. Meyer, 742 F.2d at 373.  The court concluded that the "facts of the incident out of which the criminal charges grew made it inconceivable that a jury would have acquitted Evans because he was too intoxicated to form the intent required to commit these crimes."  Id. at 374 (citation omitted).  The court noted that "[i]t is not the normal practice of lawyers to advise their clients of every defense or argument or tactic that while theoretically possible is hopeless as a practical matter."  Id.

In sum, Petitioner has shown neither deficient performance nor prejudice with respect to this claim.   Thus, this claim is without merit.

## B. Ground Two

In ground two, Petitioner asserts that counsel failed to investigate a voluntary intoxication defense.   Specifically, Petitioner contends that counsel "failed to interview key witnesses whose names had been given to him by Mr. Paquette.   These witnesses either saw Mr. Paquette taking drugs and drinking alcohol that day or saw his intoxicated state that day.[22]   He also failed to follow up on Mr. Paquette's medical records."   Petitioner's Memorandum of Law in Support of Amended Petition for Writ of Habeas Corpus (Doc. #28), filed January 12, 2005, at 11.   "Although his attorney did obtain some documentation concerning Mr. Paquette's prescription drug habit, he did no further investigation into the facts of the case and did not have Mr. Paquette examined by a psychiatrist."   Petition at 5C.

Respondents contend that this claim is procedurally barred because it was not included in Petitioner's appeal of the denial of his Rule 3.850 motion for post-conviction relief.   See Response at

---

[22]   Petitioner did not specifically identify these witnesses. Presumably, he is referring to the witnesses listed by Plaintiff in the letter Plaintiff sent to Mr. Monahan (P.E.3).   The witnesses identified in that letter include Christine Gilbert, Dana Arron, George Town, Officer Steve Huckleberry, Grady Gilbert, Regina Paquette.   At the evidentiary hearing, he stated that Regina Paquette, Christina Gilbert and Grady Gilbert would have testified on his behalf.   Tr.1 at 143.

10-11.   This  Court  agrees  that  portions  of  this  claim  are procedurally barred for the following reasons.

Petitioner  raised  a  failure  to  investigate  claim  in  state court as ground three in his Rule 3.850 motion for post-conviction relief.  See Ex. G at 49-51.  However, he only identified two areas that counsel should have investigated further.  First, he alleged that Officer Huckleberry could have testified that the Petitioner was highly intoxicated on prescription medications at approximately 1:30 p.m. on the day in question and that Petitioner was handing out  some  of  his  medications  to  other  individuals  at  that  time. Petitioner  also  alleged  that  his  doctor  had  written  a  letter stating  the  Petitioner  "had  an  addiction  problem  dating  back  at least  ten  years."  Id. at 8.  Petitioner did not claim in state court that counsel was informed of any other potential witnesses or evidence that may have supported a voluntary intoxication defense. Thus,  Petitioner  did  not  exhaust  the  portions  of  his  claim  in ground two of the Amended Petition that were not included in ground three of his Rule 3.850 motion for post-conviction relief.

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies.  See Castille v. Peoples, 489 U.S. 346, 349, reh'g denied, 490 U.S. 1076 (1989); Rose v. Lundy, 455 U.S. 509 (1982).  "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a

habeas petition." <u>Turner v. Crosby</u>, 339 F.3d 1247, 1281 (11th Cir. 2003), <u>cert</u>. <u>denied</u>, 541 U.S. 1034 (2004) (quoting <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999)). "This exhaustion doctrine 'is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts.'" <u>Turner</u>, 339 F.3d at 1281 (quoting <u>O'Sullivan</u>, 526 U.S. at 845).

The courts of Florida must be given an opportunity to consider Petitioner's legal theory of a federal constitutional deficiency and the factual basis for that theory. <u>Picard v. Connor</u>, 404 U.S. 270, 277 (1971).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 [1971] ) (internal quotation marks omitted). The Supreme Court has written these words:
>
>> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts . . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

> > *Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  <u>See</u>
> > <u>also</u> <u>Duncan</u>, 513 U.S. at 365, 115 S.Ct. at 888
> > . . . .

<u>Snowden v. Singletary</u>, 135 F.3d 732, 735 (11th Cir.), <u>cert</u>. <u>denied</u>,

525 U.S. 963 (1998).

Generally, a federal habeas petition should be dismissed if

the petitioner has failed to exhaust state remedies.  <u>See</u> <u>Keeney v.</u>

<u>Tamayo-Reyes</u>, 504 U.S. 1, 10 (1992).  A federal court need not

dismiss the petition to allow for exhaustion of state remedies,

however, if such a dismissal would be futile.

> > [I]f the petitioner simply never raised a
> > claim in state court, and it is obvious that
> > the unexhausted claim would now be
> > procedurally barred due to a state-law
> > procedural default, the federal court may
> > foreclose the petitioner's filing in state
> > court; the exhaustion requirement and
> > procedural default principles combine to
> > mandate dismissal.

<u>Bailey v. Nagle</u>, 172 F.3d 1299, 1303 (11th Cir. 1999) (per curiam)

(citing <u>Snowden</u>, 135 F.3d at 737).

Here, it would be futile to dismiss this case to give the

Petitioner an opportunity to exhaust the additional allegations in

ground two that were not presented to the trial court in his Rule

3.850 motion.  If Petitioner attempted to present these additional

facts in support of his claim in another Rule 3.850 motion at this

time, such a motion would be subject to dismissal as successive,

<u>see</u> Fla. R. Crim. P. 3.850(f), and untimely.  <u>See</u> Fla. R. Crim. P.

3.850(b).  Thus, Petitioner has procedurally defaulted the portions

of his claim under ground two that were not presented in his Rule 3.850 motion.

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 540 U.S. 1222 (2004).   "[A] petitioner may gain federal review of an otherwise procedurally defaulted claim if he can demonstrate both cause excusing the default and actual prejudice resulting from the bar."   Hill v. Jones, 81 F.3d 1015, 1022-23 (11th Cir. 1996) (citations omitted), cert. denied, 519 U.S. 1119 (1997).

"[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice." Fortenberry v. Haley, 297 F.3d 1213, 1222 (11th Cir. 2002) (per curiam) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), cert. denied, 538 U.S. 947 (2003).   The fundamental miscarriage of justice exception is only available in extraordinary cases upon a showing of "'actual' innocence" rather than mere "'legal' innocence."   Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002).

Here, Petitioner has not shown both cause excusing the default and actual prejudice resulting from the bar.   Furthermore, he has not shown that he is entitled to the fundamental miscarriage of

justice exception.    Thus,  the  Court  need  not  address  the procedurally barred portions of ground two.

Insofar  as  Petitioner  may  be  attempting  to  raise  the  same ineffectiveness  claim  here  that  he  presented  in  his  Rule  3.850 motion, he is not entitled to relief.  As noted above, he raised this claim as ground three in his Rule 3.850 motion.  In the order denying this claim, the trial court noted that a "guilty plea cuts off  inquiry  into  all  issues  arising  prior  to  the  plea  with  the exception of issues expressly preserved for appellate review, and issues regarding jurisdiction, legality of the sentence imposed, failure of the state to abide by the plea agreement, and the voluntary  and  intelligent  nature  of  the  plea."   Ex.  G  at  95 (citations  omitted).   For  this  reason,  the  trial  court  found Petitioner's claim that counsel was ineffective for failing to properly investigate the charges and for failing to depose or investigate  a  key  witness  was  without  merit.   Id. at  96. Petitioner raised this issue on appeal of the order denying his Rule 3.850 motion, see Ex. J at 6-9, and the First District Court of Appeal affirmed the trial court's order.

The  trial  court  properly  found  that  Petitioner's  claim concerning counsel's alleged failure to investigate the charges and to depose or investigate a key witness was waived since Petitioner pled nolo contendere.  The state court's adjudication of this claim was  not  contrary  to  clearly  established  federal  law,  did  not

48

involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[23]

In the alternative, the Court finds Petitioner's claim under ground two to be without merit.  The Eleventh Circuit recently addressed an ineffective assistance of counsel claim with respect to an alleged failure to investigate a possible defense, and noted the following.

> "In general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense."  Fortenberry v. Haley, 297 F.3d 1213, 1226 (11th Cir. 2002).  Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'"  Id. (citation omitted).  In evaluating counsel's investigation, we have held that "counsel need not always investigate before pursuing or not pursuing a line of defense.  Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly."  Chandler, 218 F.3d at 1318 (citing Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066).
>
> In this context, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims.  "Once we conclude that

---

[23] The Court notes that this ineffectiveness claim is refuted by Petitioner's sworn statement during the plea colloquy that he was satisfied with the performance of his attorney.

> > declining to investigate further was
> > a reasonable act, we do not look to
> > see what a further investigation
> > would have produced." <u>Rogers v.
> > Zant</u>, 13 F.3d 384, 388 (11th Cir.
> > 1994).
> >
> > <u>Callahan</u>, 427 F.3d at 933 (citation and
> > quotation marks omitted; emphasis added).

<u>Michael v. Crosby</u>, 430 F.3d 1310, 1320-21 (11th Cir. 2005).

For the reasons stated above in the discussion of ground one, Mr. Monahan's failure to investigate a voluntary intoxication defense was objectively reasonable because the facts did not support such a defense and Petitioner had expressed a desire to enter a plea rather than proceed to trial in case number 99-154-CF-52. Thus, counsel's performance was not deficient. Even assuming arguendo that counsel's performance was deficient, Petitioner has not shown prejudice for the reasons stated in the discussion of ground one.

Finally, this Court agrees with Respondents' contention that this issue has been insufficiently pled, that little or no evidence was presented on this claim, and that Petitioner appears to have abandoned this ground. <u>See</u> Amended Response to Amended Petition (Doc. #31) at 12-13; Post Hearing Memorandum (Doc. #71) at 17-18. Accordingly, for all of the above-stated reasons, Petitioner is not entitled to relief on the basis of ground two.

## VI. Recommendation

For the above-stated reasons, the undersigned recommends that the Amended Petition be denied and that this case be dismissed with prejudice.

**DONE AND ENTERED** at Jacksonville, Florida, this 8th day of March, 2006.

*Thomas E. Morris*
_____
**THOMAS E. MORRIS**
United States Magistrate Judge

ps 2/28
c:
Ass't Federal Public Defenders Lynn Palmer Bailey & Lisa Ann Call
Ass't Attorneys General Bonnie Jean Parrish & Pamela J. Koller